# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HENRY BARROWS, | )<br>) |
| Plaintiff, | ) Case No. 16 C 7882<br>) |
| v. | ) Judge Virginia M. Kendall<br>) |
| DR. CATHERINE LARRY, *et al.*, | )<br>) |
| Defendants. | )<br>) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Henry Barrows, an inmate in the Illinois Department of Corrections ("IDOC"), is no stranger to this Court. Unfortunately, Barrows suffers from severe schizophrenia and sever effective disorder. As a result, he has filed a number of lawsuits against IDOC for its failure to protect him during his mental breaks—essentially its failure to protect him from himself. Previous lawsuits have settled and one was dismissed for his failure to follow up with this Court's preliminary instructions. *See Barrows v. Gyimah*, No. 12 C 6063 (N.D. Ill.); *Barrows v. Olsen-Foxon*, No. 12 C 7862 (N.D. Ill.); *Barrows v. Olsen-Foxton*, No. 23 C 1889 (N.D. Ill.). Barrows now sues again alleging violations of 42 U.S.C. § 1983 by Defendants Dr. Catherine Larry; IDOC Director John Baldwin; former Stateville Correctional Center Warden Tarry Williams; Wexford Health Sources, Inc.; IDOC; and seven correctional officers for their failure to protect him when he slit his wrists alleging that they were deliberately indifferent to his serious mental health needs, which caused him to injure himself. As relief, Barrows seeks damages and injunctive relief in the form of a transfer from Menard Correctional Center to "a correctional facility in IDOC with adequate mental health unit and personnel." *See* (Dkt. 65) at 7–8. Currently before the Court is Dr. Larry and Wexford's motion to dismiss. (Dkt. 75). The motion to dismiss is denied and the case shall move forward with discovery.

# BACKGROUND[1]

Plaintiff Henry Barrows is currently incarcerated at Menard Correctional Center. (Dkt. 65) at ¶ 5. Barrows was previously incarcerated at Stateville Correctional Center and Pontiac Correctional Center. Wexford provides mental health treatment services at all three IDOC facilities, and Dr. Catherine Larry works at Stateville. *Id.* at ¶¶ 8, 30.

Barrows suffers from schizophrenia and severe affective disorder. *Id.* at ¶ 5. In his past lawsuits filed in federal court, he has sought relief for incidents at Stateville in which (1) he was refused psychiatric care despite his statements that he would harm himself and (2) he then repeatedly set fire to various body parts and was denied prompt medical care for his resultant burns. *See, e.g.*, *Barrows v. Gimyah*, No. 12 C 6063 (Dkt. 66) (N.D. Ill.). On August 4, 2015, while at Stateville, Barrows started having "auditory hallucinations" and began cutting his arms and wrist with a piece of metal that he had pried loose from his bunk bed. He was able to request help from a crisis team, and a mental health professional (not Dr. Larry) intervened and had Barrows transferred to the prison health care unit, where he was placed "in watch." (Dkt. 65) at ¶¶ 17–18. While there, Barrows started cutting himself again. Instead of continuing the health care treatment, restraining him, or protecting him, Defendant Jeffrey Sawyer (a correctional officer) moved Barrows to X-House because Sawyer's wife, who was in charge of the health care unit, did not want Barrows in the unit because Barrows had previously been uncooperative and unpleasant to her. *Id.* at ¶ 22. X-House, however, was an unfinished building under construction for suicide watch inmates and as such was littered with metal objects from construction, providing Barrows with access to numerous materials to use to continue to cut

---

[1] The facts are drawn from Barrows' corrected second amended complaint. For the purposes of Defendants' motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. *See Williamson v. Curran*, 714 F.3d 432, 435 (7th Cir. 2013).

himself. *Id.* at ¶ 19. Barrows continued to cut himself while in a cell in X-House and the supervising correctional officers failed to prevent him from doing so. *Id.*

According to Barrows, another individual was called to provide medical treatment, but Barrows refused and the individual failed to take further action aside from admonishing Barrows. *Id.* at ¶ 20. Eventually, Dr. Larry was called. *Id.* at ¶ 23. Once in X-House, Dr. Larry did not order Barrows to be removed to the medical unit. Instead, she told him that he had to remain in X-House because "the guards wanted to keep him" there, and that she could not order him moved. Although she observed his injuries, she did not order that he be placed in four-point restraints. *Id.* Subsequent to his interaction with Dr. Larry, Barrows resumed cutting his wrists and succeeded in cutting a vein, sustained blood loss, and passed out due to blood loss. *Id.* at ¶ 24. Barrows ultimately was taken to the health care unit in a wheelchair, at which time he was put in four-point restraints and given care. *Id.* at ¶ 26.

Following the August 4, 2015 incident, Barrows was transferred to Pontiac, where he received adequate mental health treatment and supervision, including counseling, monitoring of his medications, and frequent visits with psychiatric personnel and visits with mental health professionals. *Id.* at ¶ 31. In 2017, Barrows was transferred to Menard, which—according to Barrows—does not possess a mental health unit, where Barrows' medications are not properly monitored, and where he receives limited counseling and few visits with a mental health professional. *Id.* at ¶ 32. As a result of this transfer, Barrows' hallucinations and ideations of self-injury have returned. *Id.* Accordingly, Barrows asserts that Wexford has failed to take actions to ensure that he would receive adequate and proper mental health treatment in a facility properly equipped for such treatment in violation of his constitutional rights. *Id.* at ¶¶ 34, 38.

Defendants Dr. Larry and Wexford now move to dismiss Barrows' claims against them for failure to state a claim.

## LEGAL STANDARD

Defendants' seek dismissal of Barrow's claims against them under Federal Rule of Civil Procedure 12(b)(6), which challenges the claims' legal sufficiency. For a claim to survive a motion to dismiss brought pursuant to Rule 12(b)(6), it must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when the complaint contains factual content that supports a reasonable inference that the defendants are liable for the harm. *Id*. In making the plausibility determination, the Court relies on its "judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679). The complaint should be dismissed only if the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations. *Christensen v. Cty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007) (citations omitted). For purposes of this motion, the Court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in Barrows' favor. *See Williamson*, 714 F.3d at 435.

## DISCUSSION

### A. Dr. Larry

Correctional officials and health care providers may not act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (internal quotations and

citation omitted). Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the Defendant in question must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle*, 429 U.S. at 103–04; *see also Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016); *Roe v. Elyea*, 631 F.3d 843, 862 (7th Cir. 2011).

A medical condition is sufficiently serious to satisfy the objective element of the inquiry if the condition "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008) (citing *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005)). A non-life-threatening medical condition may be sufficiently serious if it "would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Roe*, 631 F.3d at 857 (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Here, Defendants do not dispute the seriousness of Barrows' alleged medical condition, and indeed, Barrows' allegations sufficiently plead that his schizophrenia and severe affective disorder, combined with his auditory hallucinations and self-injurious behavior, placed him at a significant risk of harm. *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (citing *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006)) ("[I]t goes without saying that suicide is a serious harm."); *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2000) ("The need for a mental illness to be treated could certainly be considered a serious medical need.") (citation omitted); *see also, e.g.*, *McIntosh v. Wexford Health Sources, Inc.*, 2017 WL 1067782, at *4 (S.D. Ill. Mar. 21, 2017) ("Suicide, attempted suicide and other acts of self-harm clearly pose a 'serious' risk to an inmate's health and safety, and may provide the foundation for deliberate indifference to medical needs and failure to protect claims.") (citing *Collins*, 462 F.3d at 760); *Granados v.*

5

*Rasmussen*, 2015 WL 6966041, at *3 (E.D. Wis. Nov. 10, 2015) (holding, on screening of a complaint, that an inmate's thoughts of self-harm, defendants' awareness of such thoughts, and defendants' actions in leaving the plaintiff with items he could use to injure himself stated an Eighth Amendment claim).

Once it is determined that there is a serious medical condition, "[d]eliberate indifference requires that a defendant 'knows of and disregards an excessive risk to inmate health or safety.'" *Zaya*, 836 F.3d at 804 (quoting *Farmer*, 511 U.S. at 837); *see also Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010) (the second element of the deliberate-indifference inquiry requires a "dual showing" that the defendant subjectively knew the prisoner was at substantial risk for committing suicide and intentionally disregarded that risk). "The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.* "With respect to the culpable state of mind, negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense." *Lee*, 533 F.3d at 509 (citing *Farmer*, 511 U.S. at 836–37). Dr. Larry moves to dismiss the deliberate-indifference claim against her, arguing that her involvement in the August 2015 incident was "remote"; her failure to order Barrows to be put in four-point restraints or returned to the health care unit does not, by itself, rise to the level of deliberate indifference; and that she did not have the authority to order his move anyway. *See* (Dkt. 75) at 7.

"A medical professional acting in [her] professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Roe*, 631 F.3d at 857 (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "Prison officials have an

6

obligation to intervene when they know a prisoner suffers from self-destructive tendencies," *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012). Here, Barrows had already cut his wrists both on the floor and then in X-House. Other correctional officers had attempted to intervene and told him to stop but he did not, and then they called Dr. Larry. Therefore, when she arrived on the scene, she would have observed the previous injuries and she would have been aware that he had a history of previous injuries because he had been housed in the medical facility in the past and that was the reason that Defendant Sawyer's wife did not want him there. The allegations show that Dr. Larry was informed that "the guards," presumably including Sawyer, wanted to keep Barrows in X-House and did not want Barrows in the mental health medical unit; Dr. Larry agreed not to move him there. At this stage of the pleadings, the allegations allege that Dr. Larry allowed her medical judgment be over-ruled by the correctional officers' wishes, which were potentially biased due to Defendant Sawyer's relationship with his wife.

A doctor cannot escape liability by saying that she could not order the correctional officers to move an inmate to a medical unit for treatment. Had she ordered him moved to the medical floor for treatment and the officers over-ruled that decision, this would be a very different case. A doctor who observes a potential life-threatening situation has an obligation to intervene. *See Rice ex rel. Rice*, 675 F.3d at 665. Any other conclusion would mean that any time a doctor observed, for example, an inmate with a 105 degree fever and believed that he might have a life threatening infection could simply say, "well the officers say they have no time to move you to the medical unit and there is nothing I can do to order them to do it." Of course, the doctor would have the obligation to enter the medical order to move the dying inmate to the medical unit for treatment. If the correctional officers refused, this motion to dismiss could be

granted. But here, Dr. Larry observed the inmate first-hand, knew of his history, and deferred to the correctional officers when the risk of death or injury was high. Those allegations survive a motion to dismiss.

**B.     Wexford**

Next, Defendant Wexford contends that the § 1983 claim against it fails to comply with the standard set forth in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Under *Monell*, a municipality may be liable for money damages under § 1983 "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690). The *Monell* standard applies to private entities acting as government agents, which are treated as municipalities for the purposes of § 1983 claims. *Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 796 (7th Cir. 2014); *see also Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (*Monell* principles apply to private corporation that provides medical care services to prison inmates; plaintiff must thus show entity's policy, practice, or custom caused constitutional violation); *accord Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 378−79 (7th Cir. 2017) (en banc); *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). Similarly, under § 1983, respondeat superior liability does not apply to such private entities. *Shields*, 746 F.3d at 789.

In order to recover against Wexford, therefore, Barrows must allege that "his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Id.* at 796 (citing *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004)). Further, Barrows must allege that

"there is a policy at issue rather than a random event." *Thomas*, 604 F.3d at 303. In other words, establishing a widespread custom or practice requires more than a single instance of the relevant conduct. *Id.*

Here, Barrows' complaint alleges that, knowing he was at a serious risk of injury to himself in the past, Wexford instead had a policy of moving him to a facility where he would not receive effective treatment. The policy of not taking into account his serious mental health condition and moving him to a facility that has caused his hallucinations and ideations to recur is a serious injury. The motion to dismiss Wexford is denied.

## **CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss (Dkt. 75) is denied. At this stage of the pleadings, the complaint states a claim and the parties will proceed to discovery to determine if those claims can survive.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: February 21, 2018