# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| HENRY BARROWS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 C 7882 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| DR. CATHERINE LARRY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Henry Barrows, an inmate within the Illinois Department of Corrections, has been diagnosed with schizoaffective disorder and has a history of suicide attempts involving cutting. On August 4, 2015, Barrows informed the prison's crisis team that he was hallucinating, had suicidal thoughts, and stated that he "may assault" correctional officers. He was initially placed in the Health Care Unit, but then was moved to a suicide cell in X House. While in X House, he was under suicide watch, but still managed to cut himself several times, causing injury. Barrows now brings this suit under Section 1983, claiming deliberate indifference.

The defendants have moved for summary judgment, arguing that Barrows has failed to show that the defendants were subjectively aware of a specific, serious medical need or risk nor that defendants have demonstrated a culpable mental state by deliberately ignoring Barrows' alleged need or risk. (Dkt. 118; Dkt. 119-1). In the alternative, defendants John Baldwin, Sergeant Jeffrey Sawyer, Lieutenant Eselina

1

Givens, Sargent Troy Mayes, and Emmanuel Egbe move for summary judgment on qualified immunity grounds. (Dkt. 119-1). Because a genuine dispute of material fact remains in this case and Sgt. Sawyer has failed to show that he was not deliberately indifferent to Barrows' threat of suicide, the Court denies Sgt. Sawyer's Motion for Summary Judgment. Because there are no genuine disputes of material fact for the remaining defendants, the Court grants Dr. Catherine Larry, Wexford Health Sources, Inc., John Baldwin, Lt. Eselina Givens, Sgt. Troy Mayes, and Emmanuel Egbe's Motion for Summary Judgment.

## BACKGROUND

The Plaintiff, Henry Barrows, is an inmate within the Illinois Department of Corrections, and in August 2015 was incarcerated at Stateville Correctional Center. (Dkt. 130 ¶ 1). Prior to August 4, 2015, Barrows was diagnosed with schizoaffective disorder, and had made several suicide attempts that involved cutting. (Dkt. 132 ¶¶ 1-2). Barrows has also experienced hallucinations, suicidal thoughts, and blackouts throughout his incarceration within IDOC. (Dkt. 130 ¶ 9).

Plaintiff has a long history before this Court having filed three previous Section 1983 cases all alleging deliberate indifference for various medical and facility defendants' failure to protect him from committing suicide attempts. *See Barrow v. Gyimah et al*, 12-6063 (alleging defendants failed to stop him from cutting himself - settled with assistance of court-recruited counsel); *Barros v. Olsen-Foxen et al*. 12-7862 (alleging defendants failed to stop him from setting fire to his ankle – dismissed for failure to follow court orders regarding in forma pauperis standard); *Barrows v.*

*Olsen-Foxen et al,* 13-1889 ( alleging defendants failed to care for his burn – settled with the assistance of counsel) as well as three cases filed in the Central District of Illinois and one filed in the Southern District of Illinois. The Court has always recruited attorneys to represent Mr. Barrows due to his mental health condition; ye Mr. Barrows has not always chosen to have the representation. He is represented on this case and was represented when responding to the Motion for Summary Judgment. In spite of that, he has failed to demonstrate any disputed fact that would require this Court deny Defendants' Motion.

On August 4, 2015, at approximately 1:15 p.m., Barrows informed the Stateville crisis team that he was hallucinating, had suicidal thoughts, and stated he "may assault" one of the correctional officers. (Id. ¶ 8; Dkt. 119-4 at 3). As a result of Barrow's suicidal thoughts, the crisis team placed him in the health care unit ("HCU") and on a 15-minute close supervision. (Dkt. 130 ¶ 10). Defendant Dr. Catherine Larry, who at the time was the mental health site services director for Wexford Health Sources, Inc., stated that there is a progression of crisis supervisions that includes "a 30-minute to a 15- to 10-minute suicide watch, continuous watch, and if that doesn't allow the behaviors to stop or subside, we'll move to therapeutic restraints or restraints for mental health purposes." (Id. ¶ 11; Dkt. 117-1 at 141:7-12; Dkt. 129 ¶¶ 1, 2). Crisis supervisions include a restriction of property and a controlled environment, and inmates are placed on crisis supervision if they are at an immediate risk of harm or suicide. (Dkt. 129 ¶ 2). The mental health team determines when to place an inmate on crisis supervision, and the correctional

officers are in charge of monitoring the inmates on crisis supervision. (Id. ¶ 3; Dkt. 130 ¶ 12).

At 3:10 p.m. the same day, while in the HCU, Barrows cut his left arm with something from his bed. (Dkt. 130 ¶ 13). Nurse Virginia Garcia treated his "4 cm superficial laceration" and placed him on 10-minute suicide watch. (Id.; Dkt. 119-6 at BARROWS000071). At 3:40 p.m., due to undisclosed "security reasons," Barrows was transferred from HCU to a suicide cell in X House, while remaining on a 10-minute suicide watch. (Dkt. 130 ¶ 14; Dkt. 119-6 at BARROWS000071). The parties dispute whether security reasons actually existed. (Dkt. 130 ¶ 14). Prior to and during his transfer, Barrows told prison staff that he wanted to remain in HCU. (Dkt. 132 ¶¶ 7, 13). Additionally, Barrows stated that he heard Ms. Sawyer, who worked in the HCU, tell correctional officers that she wanted him moved from HCU to X House. (Id. ¶ 5; Dkt. 119-5 at 36:17-24; 38:1-11). The parties dispute whether Ms. Sawyer made these statements. (Dkt. 132 ¶ 5). The parties also dispute who made the decision to transfer Barrows to X House. (Dkt. 130 ¶¶ 14, 15). Dr. Larry stated that correctional officers determine where an inmate gets located within the prison. (Dkt. 129 ¶ 4).

X House is a unit in the prison that includes inmates in protective custody, cell house workers, and inmates on crisis watch. (Dkt. 130 ¶ 16). On August 4, 2015, X House was recently under construction, and Sgt. Troy Mayes, a correctional sergeant at Stateville, stated that X House is a "pretty old house" with plaster walls and bars on the cells. (Id.; Dkt. 119-7 at 54:10-13). Prior to Barrows entering his cell in X

House, Officer Palma conducted a shakedown of his cell to remove any contraband or hidden objects that Barrows could potentially use to harm himself. (Dkt. 130 ¶ 17). However, Barrows stated that despite the shakedown of the cell by Officer Palma, there was still "a bunch of welding pieces inside the cell." (Id.; Dkt. 119-5 at 46:9-10). The parties dispute whether any contraband or metal objects remained in the cell after the shakedown. (Dkt. 130 ¶ 17; Dkt. 119-5, 45: 8-11; 46: 5-13).

Defendant Sgt. Jeffrey Sawyer, a correctional major at Stateville and husband of the previously mentioned Ms. Sawyer, assigned Officer Palma to monitor Barrows while he was on 10-minute suicide watch in X House. (Id. ¶¶ 4, 17; Dkt. 132 ¶ 6). At 3:55 p.m., Officer Palma observed Barrows scratching at his left arm and bleeding. (Dkt. 130 ¶ 18; Dkt. 119-8 BARROWS000008). Officer Palma gave Barrows a direct order to stop, notified Sgt. Mayes, and then observed Barrows flush the toilet. (Id.). Emmanuel Egbe, a correctional medical technician at Stateville, was summoned to X House to provide medical care to Barrows. (Id. ¶¶ 7, 19). Barrows had two superficial cuts on his left arm with a small amount of bleeding. (Id. ¶ 19; Dkt. 119-6 at BARROWS00072). At that time, Barrows told Egbe, "I will continue cutting." (Dkt. 119-6 at BARROWS00072; Dkt. 130 ¶ 19).

At 4:30 p.m., Sgt. Sawyer sent crisis team member, Dorcey Douglas, to X House to speak with Barrows about his crisis. (Dkt. 130 ¶ 20). Barrows told Officer Douglas that as long as he was in X House he would continue to cut himself, and that the first chance he got he was going to hit Sgt. Sawyer and Sgt. Mayes. (Id.). At this time, Officer Douglas called Dr. Larry, and Dr. Larry gave permission to place Barrows on

continuous watch. (Id.). Throughout Barrow's crisis on August 4, Dr. Larry was not on site, nor did she see him in-person. (Dkt. 129 ¶ 5). After the 4:30 p.m. incident, Barrows remained in X House. (Dkt. 130 ¶ 21).

At 5:30 p.m., Egbe was again summoned to X House to administer care after Barrows was observed allegedly cutting himself. (Dkt. 130 ¶ 21; Dkt. 119-8 at BARROWS000003). Egbe attempted to administer care three times, but Barrows refused, however, Egbe observed neither bleeding nor blood on Barrows. (Dkt. 130 ¶ 21). Barrows stated that correctional officers had to wait until he cuffed up before they could enter the cell. (Dkt. 129 ¶ 35). Egbe's report again details that Barrows told Egbe that he would "continue cutting himself." (Dkt. 130 ¶ 21, Dkt 119-8 BARROWS000003).

At 6:30 p.m., Officer Palma again observed Barrows cutting his left arm with an unknown small object. (Dkt. 130 ¶ 22). Officer Palma gave Barrows direct orders to stop and notified Sgt. Mayes. Barrows did not comply with the direct order and told Sgt. Mayes that the object was a piece of metal he scraped off the bed. (Id.). Sgt. Mayes then notified Egbe and Sgt. Sawyer, who then notified Officer Douglas. (Id.).

At 6:33 p.m., Barrows passed out. (Id. ¶ 23). As a result, Sgt. Mayes called a Code 3, which is a medical emergency. (Id. ¶ 23). The parties dispute whether Barrows passed out or if he was pretending. (Dkt. 132 ¶ 20). Egbe and Nurse Lorna Anders responded to the Code 3 and administered medical care to Barrows, who was alert and had two superficial cuts, one that was 2 ½ inches in length. (Dkt. 130 ¶ 24; Dkt. 119-6 at BARROWS00076). Egbe's report states that the cut was

"approximately 4 cm" in length and that Barrow's left forearm was not bleeding when he arrived. (Dkt. 130 ¶ 24; Dkt. 119-8 BARROWS000004). Sgt. Mayes stated that he observed a "substantial amount" of blood when he entered Barrow's cell. (Dkt. 130 ¶ 24; Dkt. 119-7 at 49: 13-24, 50:1). Officer Douglas and Lt. Eselina Givens, a correctional lieutenant at Stateville, also responded to the Code 3, and by the time they arrived, medical staff was administering medical care to Barrows. (Dkt. 130 ¶¶ 3, 26). At this time, Officer Douglas called Dr. Larry for the second time, who gave permission to place Barrows in four-point restraints. (Id. ¶ 26).

After Egbe and Nurse Anders provided medical care, Barrows was escorted to the HCU. (Dkt. 130 ¶ 27). After Barrows left the cell, Defendant Mayes and other correctional officers searched the cell for any objects Barrows may have used to cut himself. (Id. ¶ 28). No objects were found. (Id.).

At approximately 7:00 p.m., Barrows was placed in four-point restraints and on a 10-minute suicide watch in the HCU. (Id. ¶ 30). At 11:40 p.m., a tactical team removed the restraints from Barrows. (Dkt. 129 ¶ 15). At that time, Barrows stated that he would not continue to harm himself. (Id.).

The next day, Barrows again cut himself on his left arm, resulting in a moderate amount of blood. (Dkt. 130 ¶ 33). Medical staff treated him for his injury. (Id.). On August 6, 2015, medical staff removed Barrows from 10-minute suicide watch and placed on him 15-minute close-supervision. (Id. ¶ 34). On August 7, 2015, medical staff again observed Barrows cutting his left arm, resulting in superficial cuts. (Id. ¶ 35). On August 14, 2015, medical staff removed Barrows from 15-minute

close supervision and placed him on 30-minute periodic check.  (Id. ¶ 36).  On August 17, 2015, Barrows was discharged from the HCU.  (Id. ¶ 37).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019).  The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether a genuine issue of fact exists, the Court must take the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *Anderson*, 477 U.S. at 255; *see also Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018).  However, the party opposing the motion for summary judgment may not rest on the allegations in his pleadings; he must come forward with evidence of a genuine factual dispute.  *Anderson*, 477 U.S 256.

## DISCUSSION

Barrows claims that defendants were deliberately indifferent to his serious medical condition, namely, his risk of suicide.  (Dkt. 128 at 4).  Defendants argue that Barrows cannot show that they deliberately ignored Barrows' medical condition.  In the alternative, defendants Baldwin, Sgt. Sawyer, Lt. Givens, Sgt. Mayes and Egbe argue that they are exempt from prosecution due to qualified immunity.  For the reasons listed below, all but defendant Sgt. Sawyer have prevailed in showing they

were not deliberately indifferent. Sgt. Sawyer has also not shown that he is entitled to qualified immunity.

## I.    Deliberate Indifference

In order to prevail on a Section 1983 claim for deliberate indifference, Barrows must prove (1) the existence of an objective, serious medical need; (2) that the defendant was subjectively aware of a specific, serious medical need or risk; and (3) that the defendant demonstrated a culpable mental state by deliberately ignoring the plaintiff's alleged need or risk. *Collins v. Seeman*, 462 F.3d 757,760 (7th Cir. 2006). The burden of proving deliberate indifference rests on the plaintiff. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

Where, as here, the harm at issue is attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant:  (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk. *Collins*, 462 F.3d at 761; *Matos ex. rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir.2003); *see also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000).  In other words, "the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life." *Collins*, 462 F.3d at 761.  However, liability cannot attach where "the defendants simply were not alerted to the likelihood that [the prisoner] was a genuine suicide risk." *Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484, 488 (7th Cir.2001).

Deliberate indifference requires "more than mere or gross negligence, but less than the purposeful or knowing infliction of harm." *Matos*, 335 F.3d at 557; *Estate of Novack*, 226 F.3d at 529. Courts have characterized the required showing as "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992). Although this is a "high hurdle for a plaintiff," *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir.2002), he "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Woodward v. Correctional Medical Services of Illinois, Inc*, 368 F.3d 917, 927 (7th Cir. 2004); *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). A defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] ... his action must be reckless before § 1983 liability can be found." *Collins*, 462 F.3d at 762 (citing *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir.2003))

Whether a prison official had requisite knowledge of substantial risk, so as to have duty to protect prisoner from harm, is question of fact subject to demonstration in usual ways, including inference from circumstantial evidence, and fact finder may conclude that prison official knew of substantial risk from very fact that risk was obvious. *Farmer*, 511 U.S. at 842-43.

In order for to be liable in this case, Barrows must also show that the defendants had personal involvement in the deliberate indifference to his medical condition. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). The Seventh Circuit has

upheld personal involvement as a necessary part of a deliberate indifference claim against a medical provider. *Vance*, 97 F.3d at 992 (7th Cir. 1996); *Payne v. Chuchich*, 161 F.3d 1030, 1039 (7th Cir. 1998). In order to hold supervisors liable for the conduct of their employees, "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997) (citing *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988). Supervisory liability will be found if the supervisor has knowledge of the subordinate's conduct and approves of the conduct and the basis for it. *Id.*

In this case, defendants do not dispute the seriousness of Barrows' medical condition,[1] and that his schizophrenic affective disorder, combined with his auditory hallucinations and self-injurious behavior, placed him at a significant risk of harm. *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (citing *Collins*, 462 F.3d at 760 ("[I]t goes without saying that suicide is a serious harm"); *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2000) ("The need for a mental illness to be treated could certainly be considered a serious medical need.") (citation omitted). Instead, all defendants dispute the second and third prongs of the Deliberate Indifference test: that the defendant was subjectively aware of a specific, serious medical need or risk; and that the defendant demonstrated a culpable mental state

---

[1] Although at Dkt 132 ¶ 1, Plaintiffs Larry and Wexford state that plaintiff cannot label his illnesses as "serious," they do not dispute this prong in their briefs.

by deliberately ignoring the plaintiff's alleged need or risk. *Collins v.* 462 F.3d at 760. Each of their claims will be analyzed in turn.

### a. Defendant Dr. Catherine Larry

Barrows must show that Dr. Larry acted with deliberate indifference to his serious medical needs or condition. *Id.* Because Dr. Larry does not dispute whether Barrow's injury was sufficiently serious, the main issue to review is whether Dr. Larry was subjectively aware that the Barrows needed treatment and was at risk for a suicide attempt but nevertheless purposely and deliberately withheld such treatment. "Prison physicians will be liable under the Eighth Amendment if they intentionally disregard a known, objectively serious medical condition that poses an excessive risk to an inmate's health." *Gonzalez v. Feinerman*, 663 F.3d 311, 313 (7th Cir.2011).

Here, Barrows has failed to show that Dr. Larry was subjectively aware that Barrows was at risk for a suicide attempt but purposely withheld treatment from him. Dr. Larry states that she not present at the site when the Barrows was threatening to harm himself and had no in-person interaction with him. (Dkt. 117 ¶ 5). When Dr. Larry was called by Sgt. Mayes at 4:30 p.m. regarding Barrow's mental health crisis, Dr. Larry gave an order to have him placed on continuous watch when he was already in the X House. (*Id.* at ¶ 6). Dr. Larry was not called again until 6:45 p.m. when the IDOC report indicates that Barrows had cut his arm and Dr. Larry then ordered Barrows to be placed in restraints in the HCU. (*Id.* at ¶ 10). Barrows

stayed in the HCU, in four-point restraints, until later in the evening when he stated he would no longer harm himself. (*Id.* at ¶ 15).

The record does not show that Dr. Larry purposefully withheld treatment for Barrows. Dr. Larry was made aware by prison staff that Barrows was undergoing a mental health crisis and was at-risk for suicidal behavior, but there is nothing to indicate that her behavior was "approaching a total unconcern" for Barrow's welfare in the face of his behavior. *Duane*, 959 F.2d at 677. Dr. Larry twice escalated Barrows level of care, and the record does not show that she was a participant in the decision to move Barrows from HCU to a suicide cell in X House. Thus, to the extent that Barrows' claim rests on the decision to place him in X House, Dr. Larry cannot be held to be deliberately indifferent as she was not personally involved in the decision and was only updated after the fact. *Vance v. Peters*, 97 F. 3d at 991.

Barrows cites to *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) to state that summary judgment is inappropriate "if a jury could reasonably conclude that a doctor knowingly adhered to a method to treat an inmate's objectively serious medical condition that she knew was not effective." (citations omitted). However, Barrows fails to show that Dr. Larry knew this was an ineffective treatment, or even that a reasonable physician in Dr. Larry's position would have known this was an ineffective treatment. In other words, Barrows has not shown that Dr. Larry failed to exercise professional judgment that could constitute deliberate indifference. Additionally, Barrows has failed to point to anything in the record to show there was an inexplicable delay. Between where Dr. Larry was alerted to the suicide threat to

where Barrows was placed in restraint, only approximately two hours elapsed, and there is nothing to indicate that this was inexplicable as Barrows was under near-constant surveillance at the time. *See Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (collecting cases with an inexplicable delay with no penological interest).

Because Barrows has not shown that Dr. Larry acted with deliberate indifference to his threat of suicide, Dr. Larry's Motion for Summary Judgment is granted.

### b.    Defendant Wexford Health Sources, Inc.

With regard to Barrows' claim against Wexford Health Sources, Inc. ("Wexford"), private corporations acting under color of state law, like municipalities, may only be held liable for injuries resulting from unconstitutional policies or practices. *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). Under *Monell*, a municipality may be liable for money damages under Section 1983 "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690). An unconstitutional policy can include both implicit policies as well as a gap in expressed policies. *Daniel v. Cook County*, 833 F.3d 728,734 (7th Cir. 2016) (quoting *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009)). An inmate can meet this burden by offering "competent evidence tending to show a general pattern of repeated

behavior (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734 (quoting *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006)). To prove an official policy, custom, or practice within the meaning of *Monell*, Barrows "must show more than the deficiencies specific to his own experience." *Id.* If relying upon indirect proof, Barrows must show evidence to allow a reasonable trier of fact to find "systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system." *Id.* (quoting *Dixon v. County of Cook*, 819 F. 3d 343, 348 (7th Cir. 2016) (quotation omitted). If Barrows accomplishes this, he must then show that a policymaker or official knew about these deficiencies and failed to correct them. *Dixon*, 819 F.3d at 348 (citing *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983)).

Here, Barrows has not shown any sort of policy or custom to indicate that this was more than an isolated event. Additionally, he has failed to produce evidence as to any other inmates at Stateville or Menard. In Barrows' response brief (Dkt. 128), he fails to even mention Wexford besides to say its Motion for Summary Judgment should be denied. (Id. at 11). Due to this, Barrows has failed to meet his burden at this stage. Wexford's Motion for Summary Judgment is granted.

### c. Defendant John Baldwin

Barrows must show that Defendant John Baldwin, the Acting Director of IDOC, acted with deliberate indifference. To do this, Barrows needs to show that Baldwin subjectively knew the prisoner was at substantial risk of committing suicide and intentionally disregarded the risk. *Collins*, 462 F.3d at 761. Barrows does not

show any facts that Baldwin was involved personally in this crisis. To be liable "for the conduct of subordinates, a supervisor must be personally involved in that conduct" in Section 1983 cases. *Lanigan*, 110 F.3d at 477. Barrows has not shown that Baldwin was cognizant of "the significant likelihood that an inmate may imminently seek to take his own life." *Collins*, 462 F.3d at 761. As liability cannot attach where "the defendants simply were not alerted to the likelihood that [the prisoner] was a genuine suicide risk," and Barrows has made no showing that Baldwin was aware of or involved in his health crisis, the Court grants Baldwin's Motion for Summary Judgment. *Boncher*, 272 F.3d at 488.

### d. Defendant Sergeant Jeffrey Sawyers

Defendant Sgt. Jeffrey Sawyer was a correctional major of IDOC at Stateville. (Dkt. 119, ¶ 3). In his complaint, Barrows alleges that Sgt. Sawyer moved him out of the HCU because Sgt. Sawyer's wife, who was in charge of the HCU, did not want Barrows there because he had been previously uncooperative and unpleasant. (Dkt. 65, ¶ 19) but the parties dispute this, as defendants indicate Barrows was moved for unnamed "security reasons." (Dkt. 130, ¶ 14; Dkt. 119-6 at BARROWS000071). The facts show that Sgt. Sawyer's main involvement entail the following: transferring Barrows from the HCU to X House, although a dispute remains whether Barrows was placed into a proper cell or if there was a proper rationale. (Dkt. 130 at ¶ 14, 16; Dkt. 119-6 at BARROWS000071; Dkt. 119-7, 16: 9-16; 80: 20-23; 92: 9-24; 93: 1-10); assigning Correctional Officer Palma to conduct Barrows' 10-minute suicide watch, although a dispute remains how thorough Correctional Officer Palma's shakedown of

the cell was (Dkt. 130 at ¶ 17; Dkt. 119-7, 22: 11-16; 93: 11-24; 94: 1-12); sending correctional officer and crisis team member Douglas to X House to speak with Barrows, who then called Dr. Larry before placing Barrows on continuous watch. (Dkt. 130 at ¶ 20; Dkt. 119-8, BARROWS000006).  Sgt. Sawyer, along with the other defendants, does not dispute the existence of a serious medical need, and he was undoubtedly aware of the risk as he ordered Barrows to be placed in X House in a crisis cell.  (Dkt. 130 at ¶¶ 14, 16).

A question of material fact remains whether Sgt. Sawyer knew and was aware that the cell in X House contained construction materials such that a suicidal prisoner with a history of cutting could find material, and whether he took this risk such to avoid placing Barrows in his wife's care.  These material facts could give rise to an inference that Sgt. Sawyer had a culpable mental state by deliberately ignoring Barrow's serious medical issue, i.e. his suicidal behavior.  *Collins v. Seeman*, 462 F.3d 757.  While it is undisputed that Correctional Officer Palma performed a shakedown of Barrow's cell in X House, (Dkt. 130 at ¶ 20; Dkt. 119-8, BARROWS000006), this does not answer what "security reasons" existed for placing Barrows in a potentially unsafe cell in the first place.  Sgt. Sawyer knew of Barrows' crisis and the facts do not show that took care to ensure Barrows' safety if, in fact, he placed him in a cell under construction instead of keeping him at HCU, despite his knowledge that Barrows was a cutter experiencing suicidal ideation.  Barrows need not show that Sgt. Sawyer "acted or failed to act believing that harm actually would befall an inmate," it is enough that Sgt. Sawyer "acted or failed to act despite his knowledge of a substantial

risk of serious harm." *Woodward*, 368 F.3d at 927. The facts do not show that Sgt. Sawyer's actions were reasonable in light of the risk of self-harm.

Sgt. Sawyer argues that "a prison official, who is a non-medical administrator, does not act with deliberate indifference for 'failure to take further action once he had referred the matter to the medical providers.'" (Dkt. 119-1 at 5 (citing *Greeno v. Daley*, 414 F.3d 645,656 (7th Cir. 2005). However, at issue here is the conduct before Sgt. Sawyer referred the matter to a medical provider, namely his decision to place Barrows in a potentially unsafe cell and not remove him, although he is one of the defendants who had authority to send him back to HCU. Thus, Sgt. Sawyer could still be deemed to be deliberately indifferent to Barrows' medical emergency.

### e.     Defendant Lieutenant Eselina Givens

Defendant Lt. Eselina Givens was a correctional lieutenant of IDOC at Stateville. (Dkt. 119, ¶ 4). It is undisputed that Lt. Givens did not have the authority to move Barrows from Health Care to X-House. (Dkt. 130 at ¶ 15; Dkt. 119-5 at 42: 3-5). Barrows must show that Lt. Givens subjectively knew he was at substantial risk of committing suicide and intentionally disregarded the risk. *Collins*, 462 F.3d at 761. Barrows cannot show sufficient facts that Lt. Givens intentionally disregarded the risk of Barrows' self-harming. Barrows alleges, but does not point to any cite in the record, that "Defendant Mayes and defendant Givens were both aware that Barrows was continuing to cut himself and neither of them asked a superior officer if Barrows should be moved back to the HCU." (Dkt. 128 at 6). Defendants state that Sgt. Mayes twice contacted medical and his immediate supervisors, Lt.

Givens and Sgt. Sawyer, regarding Barrows' attempts to cut his left arm. (Dkt. 119-1 at 6). Presumably, this put Lt. Givens on notice that Barrows was attempting to cut himself, although there are no facts to indicate she knew how serious this was nor that Lt. Givens deliberately ignored the threat of Barrows suicide, given that he was in a suicide cell on suicide watch and there are no facts that show she knew the alleged condition of the cell. In order to find Lt. Givens liable, "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see," that is to say, they must "act either knowingly or with deliberate, reckless indifference." *Lanigan*, 110 F.3d at 477 (citing *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

Lt. Givens was not immediately involved until she responded to the Code 3 after Barrows fainted. (*Id.*; Dkt. 130, ¶ 25; Dkt. 119-10, 43: 22-24; 44: 1-17). The facts at this stage simply do not show that Lt. Givens intentionally disregarded any risk that Barrows would self-harm nor that she demonstrated "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992). As such, the Motion for Summary Judgment for Lt. Givens is granted.

### f. Defendant Sergeant Troy Mayes

Defendant Sergeant Troy Mayes was a correctional sergeant of IDOC at Stateville. (Dkt. 130, ¶ 5). Mayes did not have authority to move Barrows from the HCU to X House. (Dkt. 130, ¶ 15; Dkt. 119-5, 42: 3-5). The facts show that Sgt. Mayes was involved at the following moments: at 3:55 p.m., while conducting his 10-

minute suicide watch, Correctional Officer Palma observed Barrows scratching at his left arm and bleeding, told him to stop, and then notified Sgt. Mayes (Dkt. 130 ¶ 18; Dkt. 119-8 BARROWS000008); at approximately 6:30 p.m., Officer Palma saw Barrows cutting his left forearm with a small object and notified Sgt. Mayes, who then went to Barrows cell and told him stop, before notifying Egbe and Sg. Sawyer, who notified crisis team member Officer Douglas, (Dkt. 130, ¶ 22; Dkt. 119-8 BARROWS000005); at approximately 6:33 p.m., while waiting for crisis team member Officer Douglas, Barrows passed out and Sgt. Mayes immediately called a Code 3 medical emergency. (Dkt. 130, ¶ 23; Dkt. 119-9).

Barrows must show Sgt. Mayes was subjectively aware of Barrows' specific, serious medical need or risk; and that Sgt. Mayes demonstrated a culpable mental state by deliberately ignoring this risk. *Collins*, 462 F.3d at 760. The facts do not show that Sgt. Mayes deliberately ignored Barrow's risk of self-harm or attempted suicide. When alerted to Barrows behavior, Sgt. Mayes sent Egbe to check on him and provide care, as well as alerting his supervisors. (Dkt. 119-2, ¶ 18). Additionally, when Barrows' behavior became more serious, Sgt. Mayes went directly to Barrows cell, and in the course of a few minutes, called a medical emergency. (Dkt. 119-2 at 22, Dkt. 119-8 BARROWS000005). The facts do not show that Sgt. Mayes engaged in reckless behavior, nor that he ignored the serious risk that Barrows' behavior posed. Where Sgt. Mayes did not go to check on Barrows personally, he sent a medical technician to provide care. The facts demonstrate that Sgt. Mayes was aware of the risk of Barrows' behavior and that he did not ignore Barrows' risk of self-harm.

While Barrows states that Sgt. Mayes was aware of the condition of the cell in X House when Barrows was placed inside (Dkt. 128 at 6), nowhere does Barrows show that Sgt. Mayes was behind this decision to place him there, nor that Sgt. Mayes had authority to move Barrows. Additionally, Barrows states, without citing to anything in the record, that "Defendant Mayes and defendant Givens were both aware that Barrows was continuing to cut himself and neither of them asked a superior officer if Barrows should be moved back to the HCU." (Dkt. 128 at 6). Merely alleging something without pointing to a fact in the record does not suffice at this stage, as "the party opposing the motion for summary judgment may not rest on the allegations in his pleadings; he must come forward with evidence of a genuine factual dispute." *Anderson*, 477 U.S 256.

As the record shows that Sgt. Mayes was aware of Barrows' risk of self-harm and did not ignore the serious risk, the Motion for Summary Judgment is granted as to Mayes.

### g.    Defendant Egbe

Defendant Emmanuel Egbe is a correctional medical technician of IDOC at Stateville. (Dkt. 119-1 at 6). The facts do not demonstrate that Egbe was subjectively aware that Barrows needed treatment and was at risk for a suicide attempt but nevertheless purposely and deliberately withheld such treatment. *Collins*, 462 F.3d at 761. Egbe treated Barrows several times throughout the course of August 4, 2015. At approximately 4:00 p.m., Egbe was summoned to X-House to provide medical care to Barrows after Barrows scratched his arm, causing it to bleed. (Dkt. 130, ¶ 19; *see*

*also* Dkt. 119-6, BARROWS000072; Dkt. 119-8 BARROWS000009).  Egbe stopped the bleeding and noticed Barrows had two superficial cuts. (*Id.*).  Egbe's report also quotes Barrows as stating, "I will continue cutting."  (Dkt. 130, ¶ 19, Dkt. 119-6, BARROWS000072).  While it is extremely disconcerting that Egbe noted Barrows statement and did not raise a greater alarm, his behavior does not "approach a total unconcern" for Barrows welfare.  *Duane*, 959 F.2d at 677.  Nor was his behavior the "functional equivalent of wanting harm to come to the prisoner."  *McGill v. Duckworth*, 944 F.2d 344,347 (7th Cir. 1991).  Egbe again went to treat Barrows at 5:30 p.m. and attempted to provide care three times, but Barrows refused.  (Dkt. 130, ¶ 21; Dkt. 119-6 BARROWS000073-74; Dkt. 119-8 BARROWS00003).  Egbe noted in his contemporaneous report that Barrows was not bleeding and there was no blood. (*Id.*).  Again, Barrows told Egbe that he would continue cutting himself. (Dkt. 130, ¶ 21; Dkt 119-8 BARROWS000003).  At approximately 6:30 p.m., Officer Palma saw Barrows cutting his left forearm with a small object and then notified Sgt. Mayes, who went to Barrows cell and told Barrows to stop.  (Dkt. 130 at 22).  Sgt. Mayes then notified Egbe and Sgt. Sawyer, who subsequently notified crisis team member Officer Douglas. (*Id.*; Dkt. 119-8 BARROWS000005). While waiting for Officer Douglas, Barrows passed out and Mayes called a Code 3 medical emergency, to which Egbe and nurse Lorna Adams responded and provided care. (Dkt. 130 at 24; Dkt 119-6 BARROWS00074-75; Dkt. 119-8 BARROWS000004).

While it is a much closer analysis here, the facts in the record do not indicate that Barrows has met his burden of showing that Egbe acted with deliberate

indifference. Egbe continuously responded to calls to Barrows' cell and treated or attempted to treat Barrows. He did not ignore Barrows pain so as to give rise to an inference that Egbe acted in a manner "so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1970). While Egbe's reports state that Barrows told him plainly that he would continue cutting, Barrows does not show that Egbe ignored Barrows in light of these warnings. Additionally, Egbe did not have authority to move Barrows himself, and while perhaps he could have done more to ensure Barrows was moved to the HCU earlier in light of his statement that he would continue cutting, a defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] ... his action must be reckless before § 1983 liability can be found." *Collins*, 462 F.3d at 762. In light of the facts in the record, Egbe's actions could not be deemed reckless, although imperfect. For these reasons, Egbe's Motion for Summary Judgment is granted.

## II.     Qualified Immunity

Defendants argue in the alternative that they are entitled to summary judgment on qualified immunity grounds. (Dkt. 119-1, at 9-10). The Court has granted summary judgment to all defendants but Sgt. Sawyer. Defendants argue that they are entitled to qualified immunity because Barrows cannot show that he was subjected to a constitutional violation. (*Id.*). Defendants posit that the constitutional violation is premised on his conditions of confinement, as opposed to

23

the deliberate indifference of his serious medical condition. While that may be the case for the remaining defendants, Barrows was able to show sufficient facts of a constitutional violation by Sgt. Sawyer so as to survive a motion for summary judgment for deliberate indifference for his serious medical condition, i.e. the risk of his suicide. It is well-established that "government officials violate inmates' constitutional rights when they deliberately disregard an inmate's serious medical condition, and only a trial can resolve the facts that are in dispute." *Hayes v. Snyder*, 546 F.3d 516, 528 (7th Cir. 2008); *see also Estate of Clark v. Walker*, 865 F.3d 544, 551-552 (7th Cir. 2017) (stating that the Supreme Court has long held that prisoners have an Eighth Amendment right to treatment for their "serious medical needs" such as to give rise to a clearly established right that overcomes qualified immunity); *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003); *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 988-989 (7th Cir. 2012). Therefore, as to Sgt. Sawyer, the Motion for Summary Judgment on qualified immunity grounds is denied.

## CONCLUSION

Defendant Sgt. Sawyer's Motion for Summary Judgment is denied. Genuine disputes of material fact remain as to whether Sgt. Sawyer was deliberately indifferent to Barrows' serious medical needs and whether he took this into account when he moved Barrows into a potentially unsafe cell. Sgt. Sawyer has also not shown he is entitled to qualified immunity. Defendants Dr. Larry, Wexford Health Sources, Inc, Baldwin, Lt. Givens, Sgt. Mayes and Egbe's Motions for Summary

Judgement are granted. Barrows has failed to show they were deliberately indifferent to his risk of suicide. The case against Sgt. Sawyer may proceed to trial.


Virginia M. Kendall

United States District Judge

Date: March 12, 2020